# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

## CASE NO. 25-1964

---

## JONATHAN LEWIS,

### Appellant,

### v.

## CIRCLE K STORES INC.,

### Appellee.

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA AT FLORENCE

---

## CORRECTED BRIEF OF APPELLANT

---

**BRIAN J. LEE, ESQUIRE**
**JOSEPH SANDEFUR, ESQUIRE**
**MORGAN AND MORGAN**
501 Riverside Avenue, Suite 1200
Jacksonville, Florida 32218
E-Mail: blee@forthepeople.com
E-Mail: jsanderfur@forthepeople.com
Telephone: (904) 456-6816
Facsimile (904) 456-6816
*Attorneys for Appellant*

1

## CERTIFICATE OF INTERESTED PARTIES AND
## CORPORATE DISCLOSURE STATEMENT

The Disclosure Statement from Appellant Jonathan Lewis (hereinafter "Lewis") has been attached to this Brief as composite Exhibit A.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is desired in this case. This case involves interpretation of South Carolina law regarding issues of notice of a dangerous condition on a floor, and what South Carolina law requires to establish causation as a part of a negligence claim. This case also involves expert testimony issues as well as what evidence is sufficient to establish a spoliation claim. Because it can fairly be predicted that the district courts within this Circuit, and throughout the nation, will regularly be confronted with the task of reviewing these issues, counsel submits that oral argument is appropriate and would be beneficial to the Court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT..........................................................................................2

STATEMENT REGARDING ORAL ARGUMENT...........................................2

TABLE OF CONTENTS...............................................................................3-5

TABLE OF AUTHORITIES..........................................................................6-9

STATEMENT OF JURISDICTION...............................................................10

STATEMENT OF THE ISSUES....................................................................10

STATEMENT OF THE CASE AND PROCEDURAL HISTORY

    1. Factual Background of Lewis' Fall and Circle K's Negligence..........11-13

    2. Procedural History.....................................................................13

    3. Lewis files a Motion for Spoliation Sanctions due to Circle K's repainting the parking lot stripe during litigation................................................14-17

    4. Lewis files a Motion to Exclude the testimony of Circle K's experts Dr. Calandra and Mr. Wiggins................................................................17-23

    5. Circle K files its Motion for Summary Judgment and Lewis responds in opposition. The District Court grants summary judgment as to all of Lewis' claims and denies both of Lewis' Motions.........................................23-27

SUMMARY OF THE ARGUMENT.............................................................28-29

STANDARD OF REVIEW............................................................................30

ARGUMENT

**I. THE DISTRICT COURT COMMITTED ERROR IN GRANTING SUMMARY JUDGMENT, IN FINDING THAT THE WET ENTRYWAY CONSTITUTED AN OPEN AND OBVIOUS HAZARD, AND IN FINDING THAT CIRCLE K HAD NO DUTY TO ANTICIPATE HARM.**

A. Legal Standard for Summary Judgment....................................30-32

B. A reasonable jury could find the dangerous condition created by Circle K was not open and obvious, but even if it were open and obvious, Circle K should have anticipated someone would suffer harm.

    1. The evidence was sufficient for a jury to find that the dangerous condition was not open and obvious.....................................32-33

    2. Even if the dangerous condition was open and obvious, Circle K should have anticipated the harm..........................................34-36

**II. THE DISTRICT COURT COMMITTED ERROR IN GRANTING SUMMARY JUDGMENT AS TO THE ELEMENT OF CAUSATION BY FINDING THAT SOUTH CAROLINA LAW REQUIRES EXPERT TESTIMONY TO ESTABLISH CAUSATION AND THAT LEWIS CANNOT PROVE CAUSATION**.........................................................................37-45

**III. THE DISTRICT COURT COMMITTED ERROR IN DENYING LEWIS' MOTION TO EXCLUDE THE TESTIMONY OF CIRCLE K'S EXPERTS DR. CALANDRA AND MR. WIGGINS.**

A. Dr. Calandra's testimony was erroneously allowed by the district court because Dr. Calandra employs no scientific method, developed his opinions solely for litigation, and cannot assist the jury in determining facts in issue...............................................45-51

B. Mr. Wiggins' testimony was erroneously allowed by the district court because his testimony invades the province of the jury and fails to consider all relevant data.........................................................51-54

**IV.   THE DISTRICT COURT COMMITTED ERROR IN DENYING LEWIS' MOTION REGARDING SPOLIATION**....................54-58

CONCLUSION...............................................................................................59

CERTIFICATE OF SERVICE............................................................................60

CERTIFICATE OF COMPLIANCE WITH RULE 32(a).......................................60

**TABLE OF AUTHORITIES**

| Cases/Rules | Page |
|---|---|

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986)........................................................................31

*Armstrong v. Weiland*
267 S.C. 12 (1976)..........................................................................38

*Callander v. Charleston Doughnut Corp.*
406 S.E.2d 361 (1991).....................................................................34

*Campbell v. Hewitt, Coleman & Assocs., Inc.*
21 F.3d 52 (4th Cir. 1994)...............................................................31

*Celotex Corp. v. Catrett*
477 U.S. 317, 322- 23 (1986)........................................................30,31

*Creech v. South Carolina Wildlife and Marine Res. Dept.*
328 S.C. 24 (1997)..........................................................................34

*Daubert v. Merrell Dow Pharm., Inc.*
509 U.S. 579 (1993)....................................................................passim

*Daubert v. Merrell Dow Pharms., Inc.*
43 F.3d 1311 (9th Cir. 1995)...........................................................46

*Davenport v. Walker*
280 S.C. 588 (Ct. App. 1984)..........................................................37

*Dodge– Farrar v. Am. Cleaning Servs. Co.*
54 P.3d 954 (Idaho Ct. App. 2002)...................................................42

*Elat v. Ngoubene*
993 F.Supp.2d 497 (D. Md. 2014).................................................47,52

*Elderberry of Weber City, LLC v. Living Centers-Southeast, Inc.*
794 F.3d 406 (4th Cir. 2015)................................................................30

Fed. R. Civ. P. 56(a).............................................................................30

Fed. R. Evid. 403..................................................................................51

Fed. R. Evid. 702..................................................................................45

*Franco v. Boston Sci. Corp.*
No. 2:12-CV- 02748, 2016 WL 3248505 (S.D. W. Va. June 13, 2016).......53

*Galloway v. Horne Concrete Const.*
524 Fed. Appx. 865 (4th Cir. 2013)....................................................42

*Gambrell v. Burleson*
252 S.C. 98, 165 S.E.2d 622 (1969).............................................38,43

*General Elec. Co. v. Joiner*
522 U.S. 136, 146 (1997).................................................................47,53

*Goewey v. United States*
886 F. Supp. 1268 (D.S.C. 1995)........................................................44

*Goodman v. Praxair Servs., Inc.*
632 F. Supp. 2d 494 (D. Md. 2009).....................................................54

*In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*
299 F.R.D. 502 (S.D.W. Va. 2014).......................................................57

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litg.*
227 F. Supp. 3d 452 (D.S.C. 2017)..................................................passim

*Joye v. Wiggins*
263 S.C. 334 (1974)............................................................................37

*Meadows v. Heritage Vill. Church & Missionary Fellowship, Inc.*
305 S.C. 375 (1991)...............................................................35,36

*Miller v. Atlantic Bottling Corp.*
259 S.C. 278, 191 S.E.2d 518 (1972)..................................38,43

*Nucor Corp. v. Bell*
251 F.R.D. 191 (D.S.C. 2008)..............................................55

*O'LearyPayne v. R.R. Hilton Head, II*
371 S.C. 3409 (Ct. App. 2006)............................................38

*Reyazuddin v. Montgomery Cty., Md.*
789 F. 3d 407 (4th Cir. 2015)..............................................30

*Russell v. Microdyne Corp.*
65 F.3d 1229 (4th Cir. 1995)...............................................32

*Silvestri v. Gen. Motors Corp.*
271 F.3d 583 (4th Cir. 2001)...........................................30,54

*Sims v. Giles*
343 S.C. 708 (Ct. App. 2001)..............................................34

*Sommerville v. Union Carbide Cor.*
149 F. 4th 408 (4th Cir. 2025).............................................30

*Sosebee v. Murphy*
797 F.2d 179 (4th Cir. 1986)..............................................32

*Steves & Sons, Inc. v. JELD-WEN, Inc.*
327 F.R.D. 96 (E.D. Va. 2018)............................................54

*Stoklas v. QuikTrip Corp.*
2023 WL 2540562 (D.S.C. 2023).........................................32

*Vaughn v. City of Anderson*
   300 S.C. 55 (Ct. App. 1989)..................................................................37

*U.S. v. Chapman*
   290 Fed. Appx. 253 (4th Cir. 2006)...........................................................52

*United States v. Diebold, Inc.*
   369 U.S. 654 (1962).......................................................................32

*U.S. v. McIver*
   470 F.3d 550 (4th Cir. 2006)..............................................................46

**STATEMENT OF JURISDICTION**

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The district court entered an order granting Appellee CIRCLE K STORES, INC.'s (hereinafter "Circle K") Motion for Summary Judgment, and subsequently entered a Final Judgment in favor of Circle K, which is immediately appealable. (JA 745-778) Lewis timely filed his Notice of Appeal vesting jurisdiction within this Court. (JA 780)

**STATEMENT OF THE ISSUES**

The issues in this appeal are: 1) whether the district court committed error in granting summary judgment in finding that the Circle K store's wet entryway did not constitute an open and obvious hazard, and that Circle K had no duty to anticipate harm to people; 2) whether the district court committed error in granting summary judgment as to the element of causation by finding that South Carolina law requires expert testimony to establish causation, and that Lewis did not have sufficient evidence to prove causation; 3) whether the district court committed error in denying Lewis' motion to exclude the testimony of Circle K's experts, Dr. Joseph Calandra and Mr. Brandon Wiggins; and 4) whether the district court committed error in denying Lewis' motion regarding spoliation sanctions.

**STATEMENT OF THE CASE AND PROCEDURAL HISTORY**

**1. Factual Background of Lewis' Fall and Circle K's Negligence**

This case centers on a slip and fall injury that occurred on Circle K's property in Myrtle Beach, South Carolina. On the morning of October 19, 2022, Lewis arrived at Circle K's store, parked his vehicle at the gas pump and walked inside to purchase gasoline. (JA 16 ¶ 8-9). While Lewis was inside the store, Circle K's employee, Nolan Waples, cleaned the store entrance, including the parking lot paint stripes, with water and a concrete cleaner. (JA 17 ¶10). Mr. Waples applied the cleaning chemicals in such a way that the chemicals collected on top of the painted stripe and created an unreasonably dangerous condition in the form of a slip and fall hazard. (JA 646)

While exiting Circle K's store, Lewis stepped on a wet painted parking lot stripe covered in the cleaning agent. Stepping on the slick parking lot stripe caused Lewis's foot to slip, which tore his patellar tendon in his right knee as he tried to catch himself to prevent from falling. The evidence shows that Lewis' leg buckled as he slipped, he heard pops and then fell to the ground. (JA 307, L 14-16; JA 308, L 1-5, 17-22). Dr. Nathaniel Evans, Lewis' surgeon, and Dr. Joseph Calandra, Circle K's medical expert, agreed that the usual cause of a patellar tendon rupture is the forced extension of the leg against a fixed flexion of the knee. (JA 418, L 8-16)

11

Circle K admitted that Lewis was acting reasonably as he was walking in and out of its store, and that Lewis did nothing wrong. (JA 412, L 1-7) Circle K admitted that the store entrance is a high traffic area. (JA 411, L 1-9) Despite being reasonable to do so and required by Circle K's policies and procedures, Mr. Waples failed to wear a safety vest while cleaning the store entrance to alert customers of a potential slip and fall hazard. (JA 410, L 7-11; JA 398, L 13-20; JA 401, L 11-23)

Additionally, Mr. Waples failed to place warning cones around the area being cleaned, to make customers aware of a potentially dangerous condition and a slip and fall hazard. (JA 407, L 12-16; JA 409, L 16-22) Mr. Waples admitted when the floor is wet, it could be a safety hazard and cause someone to slip and fall, and that use of a wet floor warning cone would serve to remind or warn customers the floor is wet. (JA 399, L 4-24) While Mr. Waples was cleaning the front entrance with water and the concrete cleaner, he did not take any measures to warn persons of a potentially dangerous condition despite admitting it would make sense to use a wet floor warning cone if the exterior of Circle K's premises was wet. (JA 397, L 18-24; JA 400, L 22-25)

As a result of Circle K's negligence, Lewis ruptured his patellar tendon. (JA 422, L 21-25) Lewis underwent surgery for his injuries and currently has extensive past medical expenses totaling almost $450,000. Lewis also has a 7% permanent

12

impairment to his right lower extremity according to his surgeon Dr. Evans. (JA 421, L 16-19)

## 2. Procedural History

On November 1, 2022, Lewis filed his Complaint against Circle K and another defendant, John Doe[1], in the Court of Common Pleas in South Carolina. (JA 15-19) In the Complaint, Lewis alleged the facts regarding the fall and alleged that Circle K was aware or should have been aware of the dangerous condition that it had created, and that it failed to warn Lewis of that dangerous condition, to maintain its premises, or to take any action to make it safe for its customers. (JA 16-19)

On April 26, 2023, Circle K filed its Notice of Removal based primarily on diversity of citizenship. (JA 11-12) Circle K filed an Answer to the Complaint, denying all relevant allegations, and affirmatively asserting that the condition in question was open and obvious. (JA 21-28)

---

[1] "John Doe" was named at the beginning of the lawsuit because Lewis was unsure who the person was that had cleaned the store entrance. This person was later identified as Mr. Waples. While this "John Doe" defendant formally remained in the litigation, for all the issues in this appeal, this case proceeded against Circle K.

**3. Lewis files a Motion for Spoliation Sanctions due to Circle K's repainting the parking lot stripe during litigation.**

To develop Lewis' theory of liability, Lewis hired Bryan R. Durig, Ph.D., P.E. as an expert. Key areas of inquiry for Dr. Durig were the identification of the concrete cleaner used by Circle K, and the coefficient of friction of the parking stripe in the location of Lewis' slip and fall. However, at the time of Dr. Durig's site inspection, it was learned that Circle K had repainted the parking lot stripe.

Until Dr. Durig was granted access to Circle K's property on October 16, 2023, Lewis' discovery focused on the interaction of the unknown concrete cleaner and the parking lot paint striping. Defense counsel was aware Lewis intended to conduct a site inspection of the slip and fall location months prior to the October 2023 site inspection, because as late as August 2, 2023, Lewis was asking Circle K via email for dates to conduct his site inspection. (JA 163)

On site, Dr. Durig compared photos of the fall location taken days after Lewis' fall with what he saw on site. Dr. Durig noticed "overspray" where the fall location had been painted over. Dr. Durig concluded the parking lot paint striping had been painted over since the date of Lewis's slip and fall. Circle K would later admit to repainting the parking lot stripes one month before the site inspection:

Q       And would the last time those stripes were repainted, would that have

been in September of 2023?

A    That sounds about right about a year later.

(JA 413, L 23 to 414, L 2)

Through follow up discovery, Circle K produced an invoice from Central Carolina Pressure Washing, Inc. for parking lot restriping completed on September 22, 2023. (JA 168-170) This restriping was completed 30 days *after* Lewis specifically asked Circle K for dates to conduct a site inspection. Due to Circle K's failure to preserve the paint stripe, the coefficient of friction of the stripe at the time of the fall could not be tested. Defendant's expert witness Mr. Wiggins affirms this:

Q    Is it possible to get an accurate reading on a location where an alleged slip and fall happened on a painted stripe when that stripe has in fact been repainted?

A    Well, it makes the results questionable because you're not testing the surface as it was at the time.

(JA 173, L 13-19)

Mr. Wiggins would go on to use this lack of coefficient testing as evidence that the condition at issue was not unreasonably dangerous in his expert report dated February 9, 2024. (JA 193) "However, Dr. Durig concludes that the surface is slippery without any scientific evidence in the form of a slip resistance measurement

showing the surface is not slip resistant. If the surface cannot be shown to not be slip resistant, then it cannot be established that any violations of applicable code…has occurred relevant to the fall scenario."). Circle K would then use this lack of coefficient of friction testing as a basis for summary judgment. (JA 34)

Lewis filed his Spoliation Motion on September 16, 2024, asking the district court to grant sanctions because Circle K failed to preserve the parking lot paint stripe by knowingly repainting it. (JA 156-162) Lewis argued that Circle K had a duty to preserve the incident location so that a site inspection could be performed that would have allowed Lewis' expert to determine the coefficient of friction of the parking stripe. (JA 157-158)

Lewis argued that Circle K knowingly and intentionally altered this location and prevented him and his expert from performing these tests. (JA 158-160) Lewis further argued that the evidence Circle K destroyed was relevant and necessary to his claim. (JA 160-161) Lewis requested that the district court grant a directed verdict as to his claim of negligence, but short of that, Lewis asked the court to strike Mr. Wiggins' coefficient of friction testimony and instruct the jury that they are permitted to infer that the evidence would have been unfavorable to Circle K. (JA 162)

Circle K filed its Response to this Motion on September 30, 2024. (JA 262-

269) In this Response, Circle K argued that it did not intentionally cause evidence to be lost or destroyed because it was acting within its ordinary business practice of repainting its parking lot. (JA 265) Circle K argued that the parking lot paint testing would not have provided any additional information and claimed that it was unaware at the time that the parking lot was repainted that Lewis or his expert wanted to inspect the painted area. (JA 265)

Lewis filed his Reply to this Response on October 2, 2024. (JA 555-560) Lewis argued that Circle K knew that the parking lot paint stripe as it existed at the time of Lewis' fall was material and relevant long before it was repainted, and that Circle K had a duty to preserve that evidence. (JA 555-558) Lewis also pointed out that Circle K hired a third party to repaint this stripe, which showed that it acted willfully and intentionally, and that Circle K's defense that the painting was done in the "ordinary course of business" was not a defense to destroying this relevant and crucial evidence. (JA 558-559)

### 4. Lewis files a Motion to Exclude the testimony of Circle K's experts Dr. Calandra and Mr. Wiggins.

Circle K hired two experts—Dr. Calandra, M.D., and Mr. Wiggins, P.E.— whom it intended to have testify regarding the cause of Lewis's tendon rupture and whether Circle K was negligent in maintaining its premises, respectively. Lewis filed

a Motion to exclude the testimony of both experts for multiple reasons.

During discovery it was learned that Dr. Calandra offers five opinions related to Lewis's ruptured patellar tendon: (1) Lewis had pre-existing factors for a patellar tendon tear including previous patellar tendon tears, his history as an athlete, his cigarette usage, and his weight (JA 88, L 8–14); (2) Lewis' pre-existing factors "may have" contributed to a chronically weak patellar tendon in the right knee (JA 88, L 17–22); (3) "it is possible" that the patellar tendon ruptured first and this is what caused Lewis to fall (JA 218, L 1–6); (4) it is likely that Lewis did not have a normal patellar tendon, which contributed to his injury (JA 218, L 7–14); and (5) the normal mechanism of injury for a normal patellar tendon rupture is "fixed flexion against forced extension." (JA 218, L 18 to 219, L 2)

As grounds for his opinions, Dr. Calandra offers (1) his "method" of reviewing the medical records and video evidence and then writing a report (JA 240, L 24 to 241, L 5); (2) his years of experience as an orthopedic surgeon (JA 219, L 4–6); and (3) various unspecified studies. (JA 221, L 12 to 222, L 1) Dr. Calandra himself agrees that his "method" for reaching his opinions was reading the medical records, reviewing the video, and then writing his report. (JA 240, L 24 to 241, L 5; JA 244, L 24 to JA 245, L 3) Dr. Calandra offers no way to test either his method or his opinions. (JA 238, L 13–25) Dr. Calandra has published no articles on either his

specific opinions in this case or containing his general opinions which support those he has reached in this case. (JA 143, L 9–12) Dr. Calandra admits his method is more analogous to the anecdotal report than the clinical trial. (JA 239, L 19 to 240, L 3)

Dr. Calandra testifies he has no way of knowing the error rate of his opinions. (JA 241, L 12–25; JA 242, L 13–18; JA 243, L 11–18) Dr. Calandra points to jury verdicts where juries found for the defendant for whom Dr. Calandra had testified in the past as a possible proxy (JA 241, L 19–25), but concedes that juries may have sided with those defendants for reasons other than whether Dr. Calandra's testimony was correct. (JA 242, L 13–18)

Although Dr. Calandra makes general references to studies, literature, and research, he repeatedly testified that his opinions in this case were not based on any particular studies, literature, or research. (JA 221, L 12 to 222, L 11; JA 235, L 7 to 236, L 11; JA 237, L 15–18) When asked whether he relied on any studies to form any of his opinions in the case, Dr. Calandra answered "No, I did not." (JA 226, L 2–4) When discussing the lack of studies, Dr. Calandra testified, "So there's — so those are, I guess, supporting studies so, but I don't have particular specific things in my head. I wasn't asked to look that stuff up." (JA 237, L 15–18)

While Dr. Calandra has an orthopedic career spanning approximately 40 years, he did not perform research during that time on his patients who had

experienced a ruptured patellar tendon. (JA 223, L 16–21; JA 226, L 25 to 227, L 8) He has never performed any controlled testing related to his opinions in this case (JA 238, L 4–9), never published any papers related to patellar tendon ruptures (JA 227, L 9–12), and never spoken at professional conferences about patellar tendon ruptures. (JA 231, L 21 to 232, L 6) He believes that Lewis' pre-existing factors "may have" contributed to a chronically weak patellar tendon, and "it is possible" that the patellar tendon ruptured first. (JA 88, L 17 to 89, L 5)

As for Mr. Wiggins, by its own terms, his opinion arises from "the documents reviewed by SEA Site Investigation" and purports to prescribe what can or "cannot be reasonably concluded" based on the evidence that he reviewed. (JA 248, L 15–22) Further, despite visiting the site of the fall and having ample opportunity to inspect and test the site, he chose not to take independent measurements of slip resistance. (JA 249, L 9–12; JA 260, L 19 to 261, L 6)

Mr. Wiggins fails to consider how a Circle K employee was using cleaning products when Lewis slipped and fell, and when questioned on this point, Mr. Wiggins repeatedly testified that he does not have any experience with the cleaning products at issue. (JA 253 169, L 18–23 ("…I did not grow up with a chemist father, so I don't know exactly how [the cleaning product is] supposed to work. … I don't know."); JA 255, L 24 to 256, L 16)(admitting lack of knowledge regarding the

interaction of the cleaning products and the area being cleaned and the effect that improper use of the cleaning product would have on the slip-resistance of the area being cleaned) Neither has Mr. Wiggins investigated or received training on the effect the cleaning products would have on the surface at issue. (JA 257, L 25 to 259, L 1)

Mr. Wiggins has no opinion on the proper storage of cleaning products (JA 250, L 20–25) because, as an engineer, he does not "get involved with cleaning products." (JA 251, L 1–8) The "extent of [Wiggin's] investigation into the [two] cleaning product[s]" that the Circle K employee was potentially using was "look[ing] at the directions for both" and noting that "both contemplated a — a wet application." (JA 252, L 14–19)

On September 16, 2014, Lewis filed a Motion based on *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), as to the above testimony of both Dr. Calandra and Mr. Wiggins. (JA 204-214) Lewis argued that Dr. Calandra's testimony was inadmissible because he employed no scientific method, developed his opinions solely for litigation, and because his opinions could not assist the jury in determining the facts in issue. (JA 207-210) Lewis further argued that Mr. Wiggins' opinion was inadmissible because it invaded the province of the jury and failed to consider all relevant data. (JA 211-213)

On September 30, 2024, Circle K filed its Response to Lewis' Motion. (JA 302-318) Circle K alleged that Dr. Calandra's testimony should not be excluded because it was based on scientific principles and methodology, was not just for purposes of litigation, and was generally accepted in the medical community. (JA 304-313) Circle K further alleged that Mr. Wiggins' opinions do not invade the province of the jury because they did not state a legal standard or draw a legal conclusion. (JA 313-316) Circle K further alleged that Mr. Wiggins did not fail to analyze all relevant data. (JA 316-318)

On October 7, 2024, Lewis filed his Reply in support of his Motion. (JA 626-631) As to Circle K's assertion that Dr. Calandra should be permitted to offer causal testimony based on review of medical records and video, Lewis argued that Dr. Calandra's causation opinions—specifically, that Lewis's patellar tendon rupture was spontaneous due to tobacco usage, obesity, or prior injuries—requires something more, which Dr. Calandra does not and cannot offer. (JA 626-628)

Lewis argued that Dr. Calandra's opinions regarding causation are his *ipse dixit*—something that is not allowed. (JA 628) Lewis also argued that Dr. Calandra's late-submitted articles that had never been disclosed before should be excluded. (JA 628-629)

Lewis then argued that Circle K's assertion that Mr. Wiggins did not have

notice that the improper use of concrete cleaners was at issue in this case is belied by the record, and that this failure to consider relevant facts goes to admissibility of his testimony, not just the weight of it. (JA 629-630)

**5. Circle K files its Motion for Summary Judgment and Lewis responds in opposition. The District Court grants summary judgment as to all of Lewis' claims and denies both of Lewis' Motions.**

Circle K filed its motion for summary judgment on September 16, 2024. (JA 29-42) Circle K contended that the wet concrete entryway area was not an inherently hazardous or dangerous condition, and that cleaning the entranceway with the concrete cleaner did not create a dangerous condition. (JA 33-35) Circle K further contended that even if this area constituted a dangerous condition, it was open and obvious to Lewis and Circle K would therefore have no duty of care to him. (JA 35-36) Circle K then argued that even though the store entryway getting cleaned was open and obvious, it should not have anticipated harm to people such as Lewis, despite such obviousness, because it was not on notice of prior similar customer incidents involving cleaning this area. (JA 37-38) Finally, Circle K argued that Lewis had failed to present evidence that a "slip" caused his injury. (JA 38-40)

Lewis filed his Response in Opposition to Circle K's Motion on September 30, 2024. (JA 290-304) Lewis argued that this Motion should be denied because genuine issues of material fact existed as to whether Circle K breached its duty of

care to Lewis. (JA 292-299) Lewis argued that a reasonable jury could find that Circle K breached its duty of care and created a dangerous condition by cleaning the store entranceway in a negligent manner. (JA 293-296) Lewis argued that a reasonable jury could find that the dangerous condition created by Circle K was not open and obvious, and that even if it were open and obvious, Circle K should have anticipated that someone would suffer harm based upon its own negligence in creating the dangerous condition. (JA 296-299)

Lewis further argued that Circle K's breach of its duty of care caused Lewis to slip and fall and suffer an acute patellar tendon rupture. (JA 299-301) Lewis set forth both the lay testimony of Lewis and Mr. Waples as to the mechanism of his fall. Lewis further set forth the expert testimony of his orthopedic surgeon, Dr. Evans, who testified that Lewis suffered from an acute patellar tendon rupture and that a chronic patellar tendon rupture would be incredibly rare. (JA 299-301)

On June 17, 2025, the district court filed a text order, stating that the court had reviewed the parties' briefings and directed the parties to file a supplemental brief addressing whether expert medical testimony is legally required to establish causation for Lewis' injury under South Carolina law. (JA 647) The district court directed the parties to address the cases cited on causation in the summary judgment briefings, and to also address the following:

Where, as here, there is an absence of definitive expert opinion testimony affirmatively linking the slip to an acute patellar tendon rupture, is Lewis's circumstantial and lay evidence legally sufficient to create a genuine dispute of material fact on the issue of causation, particularly where the injury may have multiple potential etiologies?

(JA 647)

Both parties filed supplemental briefs on these issues. (JA 648-654, 707-714) Lewis argued in his supplemental briefing that expert medical testimony is not required in South Carolina to establish causation for Lewis' acute patellar tendon rupture, and even if it was, there was sufficient testimony in the record to create a genuine issue of material fact for the jury to decide the issue of causation. (JA 707-714)

On August 1, 2025, the district court entered its Order on both Lewis and Circle K's motions. (JA 745-778) After giving a factual and procedural background, and noting the opinions that were to be given by Circle K's experts, the district court first took up the issue of Lewis' motion to exclude those experts. (JA 756) The district court found that Dr. Calandra's methodology adhered to common and accepted practices in the medical field, and found his opinions to be valid, relevant, and connected to the medical facts of the case. (JA 757-758) The district court found that Lewis' challenges go to the weight and credibility of these opinions and denied the motion. (JA 758) Similarly, the district court found that Mr. Wiggins' opinions

25

would not be excluded on the entryway's slip resistance because it found Lewis' challenges went to weight and credibility. (JA 761) Thus, the district court denied Lewis' motion. (JA 778)

The district court next addressed Circle K's summary judgment motion. (JA 762) The district court first found that in viewing the evidence and all reasonable inferences in favor of Lewis, a reasonable jury could conclude that the use of an improperly measured amount of CAF (concrete) cleaner created a dangerous condition at the store's entrance. (JA 763) Lewis does not quarrel with this finding.

The district court then addressed Circle K's open and obvious argument and found that because the cleaning activity and wet conditions were "clearly observable" and because Lewis testified that he was not paying attention, there was no genuine dispute of material fact as to whether the wet entryway constituted an open and obvious hazard. (JA 764-765) The district court went on to find that because Circle K had not been warned or otherwise knew that cleaning the entryway posed a specific danger to customers, Lewis could not establish evidence of foreseeability, and found that summary judgment was appropriate, ultimately granting Circle K's motion. (JA 766-767, 778)

The district court then addressed Circle K's causation argument. (JA 768) The district court found that South Carolina requires expert testimony to establish

causation. (JA 768) The district court then found that Lewis' expert testimony was insufficient to establish that his patellar tendon rupture was caused by Circle K's negligence, and that summary judgment was appropriate on the causation element of Lewis' claim. (JA 773-776, 778)

The district court finally addressed Lewis' spoliation motion. (JA 775) The district court held that the record does not support a finding of bad faith or willful misconduct because it found that Circle K's repainting was part of routine maintenance. (JA 776) The district court held that there was no material prejudice to Lewis because of the district court's previous ruling that Lewis could not meet his evidentiary burden regarding causation. (JA 777) Thus, the district court denied Lewis' motion. (JA 778)

A Judgment was entered consistent with the district court's order in favor of Circle K on August 1, 2025, and the case was dismissed with prejudice. (JA 779) Lewis filed his timely Notice of Appeal on August 13, 2025 (JA 780), and this appeal commenced.

## SUMMARY OF THE ARGUMENT

The district court committed error in granting summary judgment to Circle K with its finding that the wet entryway where Circle K had used an improper concrete cleaner constituted an open and obvious hazard. Circle K had the duty to warn invitees such as Lewis of dangerous conditions that it created, especially when that condition created a hidden danger. The dangerous condition created by Circle K in this case was not open and obvious to people walking by and because the slipperiness of this condition was a hidden danger, the district court could not find that it was open and obvious.

The district court committed further error in finding that it should not have anticipated the harm that this dangerous condition would cause to Lewis. A reasonable jury could find with the evidence that was presented by Lewis that Circle K should have anticipated that cleaning the entrance of its store, in the middle of the day and without providing any sort of warning as to the slipperiness of the condition, posed a slip and fall hazard that would cause injury.

The district court committed further error in finding that South Carolina law requires expert testimony to establish causation. It does not, as it is sufficient to establish causation for a plaintiff to present evidence which rises above mere speculation or conjecture. That evidence does not need to come from a medical

28

expert but can instead come from lay testimony. But even if this Court were to find that medical expert testimony on causation were required, Lewis presented that evidence through not only the testimony of his own surgeon but Circle K's medical expert as well.

The district court committed error in denying Lewis' motion to exclude the testimony of Dr. Calandra and Mr. Wiggins. Dr. Calandra's testimony employed no scientific method, his opinions were developed and have been used solely for litigation purposes, and these opinions would not assist the jury in determining the facts at issue in this case. Mr. Wiggins testimony is based on insufficient data or evidence and invades the province of the jury.

Finally, the district court committed error in denying Lewis' motion for spoliation sanctions related to the repainting of the parking lot just prior to Lewis' site inspection. Circle K had an obligation to preserve this evidence, Circle K intentionally caused this evidence to be destroyed, and this evidence was relevant to Lewis' claim.

Lewis respectfully requests that this Court reverse the district court's Order and Final Judgment, and remand this case back with instructions for the district court to grant Lewis' motion to strike experts and grant Lewis' motion for sanctions as set forth more fully below.

**STANDARD OF REVIEW**

This Court reviews de novo a district court's grant of summary judgment. *Elderberry of Weber City, LLC v. Living Centers-Southeast, Inc.*, 794 F.3d 406, 411 (4th Cir. 2015). This Court reviews for abuse of discretion a district court's denial of a motion to strike expert testimony. *Sommerville v. Union Carbide Cor.*, 149 F. 4th 408, 422 (4th Cir. 2025). This Court reviews for abuse of discretion a district court's denial of a motion for spoliation. *Silvestri v. General Motors Corp.*, 271 F.3d 538, 590 (4th Cir. 2001).

**ARGUMENT**

I. **THE DISTRICT COURT COMMITTED ERROR IN GRANTING SUMMARY JUDGMENT, IN FINDING THAT THE WET ENTRYWAY CONSTITUTED AN OPEN AND OBVIOUS HAZARD, AND IN FINDING THAT CIRCLE K HAD NO DUTY TO ANTICIPATE HARM.**

**A. Legal Standard for Summary Judgment**

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Reyazuddin v. Montgomery Cty., Md.*, 789 F. 3d 407, 413 (4th Cir. 2015); *see* Fed. R. Civ. P. 56(a). The moving party has the burden of showing "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact—one "that might affect the outcome of

the suit"—exists if, in viewing the record and all reasonable inferences drawn in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In *Anderson*, the U.S. Supreme Court stated that "[o]ur holding…does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…" *Anderson*, at 255. In *Celotex*, the U.S. Supreme Court again made sure to note that the federal rule 56 "must be construed with due regard…for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried before a jury…" *Id.*, at 327.

Thus, all that is required "is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, at 249. The Court should not grant summary judgment "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994). In ruling on a motion for summary judgment,

the Court must not resolve disputed facts, weigh the evidence, or make determinations of credibility. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *see Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). Inferences "drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

**B. A reasonable jury could find the dangerous condition created by Circle K was not open and obvious, but even if it were open and obvious, Circle K should have anticipated someone would suffer harm.**

**1. The evidence was sufficient for a jury to find that the dangerous condition was not open and obvious.**

An open and obvious condition on a premises is one that is evident and recognizable to a reasonable person. Under South Carolina law, an owner has a duty to warn an invitee of latent or hidden dangers of which the owner is on actual or constructive notice. *Stoklas v. QuikTrip Corp.*, 2023 WL 2540562, *2 (D.S.C. 2023). Here, the dangerous condition created by Circle K was the combination of improper use of a chemical cleaner and water on a painted parking stripe. A reasonable jury could find this dangerous condition, being on the ground and without any warnings, was not open and obvious to people walking by. By the very nature of the condition being a combination of improper concrete cleaner mixed with water, a reasonably

jury could also find that this was a hidden danger that Circle K was on actual notice as its own employee created the condition.

When Lewis exited Circle K's store, he did not see any warning signs to alert him of a potentially dangerous condition and could not tell what sections, if any, of the ground were wet. If a sign had been present to warn him of a potentially dangerous condition, he would have been alerted to know the ground was wet and would have avoided the area. Although Lewis saw Mr. Waples, Lewis believed Mr. Waples was taking a break, not working, or cleaning the area in which the dangerous condition was present.

Despite company policies requiring employees to do so, Mr. Waples was not wearing a vest to alert people that he was working. Further, it would have been impossible for Lewis to have known that the combination of water, improperly applied cleaning materials, and a painted parking lot stripe would amount to a dangerous slick surface, making this a hidden danger created by Circle K. When viewed in the light most favorable to Lewis, a reasonable jury could find the dangerous condition created by Circle K was not open and obvious, and was a hidden danger that was created by Circle K. Thus, whether the dangerous condition was open and obvious was and is a question of fact for the jury, and the district court committed error in finding otherwise.

**2. Even if the dangerous condition was open and obvious, Circle K should have anticipated the harm.**

Even when a condition is truly open and obvious, a landowner is liable when the landowner "should anticipate the harm despite such knowledge or obviousness" or "has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious...or fail to protect himself against it." *Callander v. Charleston Doughnut Corp.*, 406 S.E.2d 361, 362–63 (1991). "In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated." *Sims v. Giles*, 343 S.C. 708, 719 (Ct. App. 2001).

In *Creech v. South Carolina Wildlife and Marine Res. Dept.*, 328 S.C. 24, 27 (1997), the Supreme Court of South Carolina affirmed the lower court denying defendants' motion for directed verdict when plaintiff filed suit after falling off a dock that only had a handrail on one side. Defendants argued the trial court erred because the lack of a handrail on both sides of the dock was open and obvious and that plaintiff should have been able to protect herself. *Id.,* at 30. The Supreme Court of South Carolina disagreed and found defendants should have anticipated the type of harm that occurred despite such knowledge or obviousness. *Id.,* at 31.

34

Here, a reasonable jury could find that Circle K should have anticipated that cleaning the entrance of the store during the middle of the day, without providing any sort of warning, could pose a potential slip and fall hazard. Circle K has policies and procedures in place to warn persons of potential slip and fall hazards when a dangerous condition is created, but those procedures were not followed. When policies and procedures are put in place for a reason and then not followed, it is reasonable to anticipate the harm such procedures are designed to prevent will occur.

Circle K admitted most accidents can be avoided through assessment and proper procedures. To support its argument, Circle K argued that on seven other instances customers "successfully" navigated through the area being cleaned. By Circle K's own admission, it knew people were walking through the dangerous condition but failed to remedy the situation and provide a safe environment for people on the premises. The law does not provide a "free fall" as Circle K suggested, nor does it require Lewis to show other injuries occurred on a premises with other people to prove negligence.

Finally, no other person stepped on the painted parking lot stripe topped with incorrectly applied concrete cleaner and water as Lewis did. Circle K incorrectly relied on *Meadows v. Heritage Village Church and Missionary Fellowship, Inc.,* 305 S.C. 375 (1991), to suggest Lewis should have taken an alternative route to his

vehicle. In *Meadows*, the plaintiff parked her vehicle in a distant parking lot and proceeded to walk to her hotel, but the gravel path back was flooded so she decided to walk through the wet grass instead of other available routes and as a result she slipped and fell. *Id.,* at 376. Importantly, the court held the defendant "had no duty to warn Meadows, its invitee, about the wet grass because it was a natural condition, the peril of which was obvious." *Id.,* at 378. *Meadows* is therefore readily distinguishable from this case because Lewis' slip and fall occurred in a parking lot right in front of the only entrance to Circle K.

Additionally, the dangerous condition which caused Lewis' fall was not a natural condition, but rather one created by the negligent act of Circle K's employee, Mr. Waples. Unlike the plaintiff in *Meadows*, Lewis did not have ample paths to reach his vehicle, as Mr. Waples created the dangerous condition directly outside of the entrance of Circle K's store.

Thus, when viewed in the light most favorable to Lewis, a reasonable jury could find Circle K should have anticipated the type of harm Lewis suffered, even if this Court were to find that the dangerous condition was open and obvious, and the district court committed error in finding otherwise.

**II. THE DISTRICT COURT COMMITTED ERROR IN GRANTING SUMMARY JUDGMENT AS TO THE ELEMENT OF CAUSATION BY FINDING THAT SOUTH CAROLINA LAW REQUIRES EXPERT TESTIMONY TO ESTABLISH CAUSATION AND THAT LEWIS CANNOT PROVE CAUSATION.**

The question of proximate cause is ordinarily one of fact for the jury, as to which the trial court's only function is to inquire whether particular conclusions are the only reasonable inferences to be drawn from the evidence. *Davenport v. Walker,* 280 S.C. 588, 591 (Ct. App. 1984). "[W]hile the question of whether evidence is sufficient to survive summary judgment is generally a matter of federal procedural law, 'the "expert testimony" rule' may be 'so closely interrelated with the substantive cause of action…that federal courts sitting in diversity cases should apply the state rule in order to fully realize state substantive policy.'" *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litg.*, 227 F. Supp. 3d 452, 468 (D.S.C. 2017). Lay testimony regarding causation of a permanent injury presents a question for the jury. *Joye v. Wiggins,* 263 S.C. 334, 337–38 (1974); Where a plaintiff testifies about their ongoing medical problems, the existence of a permanent injury is a question for the jury. *Vaughn v. City of Anderson*, 300 S.C. 55, 60 (Ct. App. 1989).

When testimony of an expert witness is not relied upon to establish proximate

cause, it is sufficient for the plaintiff to present evidence which rises above mere speculation or conjecture. *Armstrong v. Weiland,* 267 S.C. 12, 16 (1976); *O'Leary-Payne v. R.R. Hilton Head, II*, 371 S.C. 340, 349 (Ct. App. 2006)(plaintiff was not required to provide expert testimony that a pipe created a dangerous or defective condition. A lay person could determine a pipe was a hazard from pictures and testimony about its height and position). Although the lay mind is not competent to pass on some conditions, there are situations where injury occurs soon after an accident, results are within the experience and observation of the ordinary person and circumstances are such that the lay mind may draw reasonable inferences of causation, even where in conflict with medical testimony. *Miller v. Atlantic Bottling Corp.,* 259 S.C. 278, 191 S.E.2d 518 (1972); *Cf. Gambrell v. Burleson,* 252 S.C. 98, 165 S.E.2d 622 (1969)(where plaintiff is in good health prior to an injury and complains that day of a condition he claims resulted from the injury, this fact alone may be sufficient evidence of causation even when medical opinion testimony is to the contrary).

Here, Circle K argued Lewis' injuries are a result of his own conduct, a trip and fall rather than a slip and fall but has no evidence to support such a contention. Circle K's medical expert Dr. Calandra opined that Lewis' patellar tendon either just suddenly ruptured while walking, or that Lewis stubbed his toe which caused this

injury. However, this opinion is based solely on reading Lewis' deposition transcript, his medical records, and watching a security video showing the incident. Dr. Calandra himself admitted to not being able to tell if Lewis tripped over his shoe or toe due to the low quality of video footage. (JA 429, L 9-20)

But the evidence supports that Lewis slipped on the painted parking lot stripe, braced himself to stop the fall, but was unsuccessful doing so which resulted in his patellar tendon injury. There is testimony from witnesses contradicting Circle K's argument, which creates a factual question for the jury. Lewis is not required to support his negligence claim with testimony from a medical expert as the district court erroneously held, as Lewis was in good health prior to the injury and inevitably complained of his injury after his slip. A reasonable juror has sufficient knowledge and life experiences to use the evidence provided at trial to make a factual determination as to whether the condition created by Circle K was the proximate cause of Lewis' injury.

But even if this Court were to find that Lewis is required under South Carolina law to prove proximate cause with testimony from a medical expert, Lewis has successfully done so. Lewis' surgeon Dr. Evans testified that an unexpected slip is a common cause of a ruptured patellar tendon. (JA 418, L 8-20) Circle K's own expert Dr. Calandra testified that the usual cause of a healthy ruptured patellar

tendon is a forced extension of the knee against a fixed flexion of the knee. (JA 737, L 18 to 738, L 2) This usual cause is the exact mechanism of how this incident occurred. Lewis's foot slipped and rolled on the chemical covered wet painted stripe, causing a forced extension against a fixed flexion. While trying to brace himself, Lewis heard pops felt in his knee and fell to the ground in extreme pain.

When Lewis arrived at his first appointment at Dr. Evans' office, a history of present illness was completed which stated that he had an injury at a local gas station, slipped, had right knee pain, and felt a pop in his leg. (JA 728, L 1-8) Dr. Evans testified that information contained within the history of present illness is part of the information needed to make an appropriate diagnosis of the injury. (JA 727, L 1-25) Dr. Evans diagnosed Lewis with a patellar tendon rupture and testified that a patellar tendon rupture is almost exclusively an acute injury. (JA 729, L 10-25) When asked whether Lewis's injury was an acute event, Dr. Evans testified as follows:

Q     Does the patellar tendon, for it to tear or rupture, does it require a pretty significant amount of –

A     Yeah, and I think that's what I'm indicating there is, that it would take a little – a decent bit of force to cause it to rupture.

Q     Based on what we just talked about, about what would potentially cause a patellar tendon to rupture and the history or present illness given by

Mr. Lewis, do you have an opinion as to whether or not Mr. Lewis' patellar tendon was an acute event?

A    I think it was, yes.

Q    Is hearing a pop when someone ruptures their patellar tendon, is that pretty common?

A    Yeah, I think people feel some sort of sensation that something is torn or ruptured or something is not quite right.

Q    Is there anything that you see in Mr. Lewis' records or based on your history or training or education and your experiences, does this seem to be a situation where Mr. Lewis' patellar tendon just spontaneously gave out?

A    No.

(JA 731, L 8 to 732, L 8)

Dr. Evans testified that patellar tendons do not tend to rupture spontaneously. (JA 735, L 6-16) When further asked about the effects of a ruptured patellar tendon, Dr. Evans explained that a person is unable to do much of anything and cannot bend the knee to get up or down. (JA 733, L 24 to 734, L 9) As to the mechanism of the fall, Dr. Evans testified:

Q    And would a person who maybe unexpectedly slips or their foot turns

one way or their knee turns another way, is that a common cause of a ruptured patellar tendon?

…

A     Yes, that would be a common mechanism, something where your knee bends quickly or unexpectedly.

(JA 688, L 8-16)

Like Dr. Calandra, Dr. Evans testified the common mechanism or usual cause of a patellar tendon rupture is a forced extension of the knee against a fixed flexion of the knee. After Lewis's foot slipped and rolled on the wet chemical covered painted parking lot stripe, he braced his leg to stop himself from falling which resulted in his patellar tendon rupturing. This was an acute event and falls squarely within both experts' common mechanism and usual cause of a patellar tendon injury.

Expert testimony is not required to prove causation when there is an immediate onset of symptoms that naturally follow from an accident or lack of any other possible cause. *In re Lipitor*, at 477; *see also Galloway v. Horne Concrete Const.*, 524 Fed. Appx. 865, 872 (4th Cir. 2013)("a plaintiff was not required to prove causation by expert evidence when she drank from a spigot and developed chemical burns in her mouth immediately thereafter"); *Dodge–Farrar v. Am. Cleaning Servs. Co.*, 54 P.3d 954, 959 (Idaho Ct. App. 2002)("[T]he causal

relationship between [plaintiff's] fall and her immediate symptoms in the ankle, knee and back (the pain, swelling, and the inability to sit, stand or walk without assistance) is within the usual and ordinary experience of the average person."); *Gambrell v. Burleson*, 252 S.C. 98, 105-6 (1969)(If "a plaintiff in good health prior to an injury begins to complain on the day of the injury with what he claims to be a condition resulting from the injury, this fact alone may be sufficient evidence of causation.").

In *Miller v. Atl. Bottling Corp.*, 259 S.C. 278, 280 (1972), the plaintiff purchased a Mountain Dew, consumed two or three sips of the drink, and immediately thereafter noticed the drink had a vile smell and taste. Prior to drinking the Mountain Dew, plaintiff was in good health but she immediately became sick upon drinking the beverage. *Id.,* at 280. Although the plaintiff's treating physician did not opine on causation, the court held that expert medical testimony was not required and stated, "we do not think that a reasonable person would necessarily require medical testimony in order to determine that the drinking and discovery of a foreign substance of the present nature in a bottled drink most probably caused the nausea and vomiting which immediately followed." *Id.,* at 281–82.

Instead, expert testimony is required when the causal relationship is not within the common sense of a reasonable juror—for example, to prove the effects of allegedly toxic chemicals on the human body, medical malpractice cases, and the

causation of dormant progressive diseases. *In re Lipitor*, at 478 (D.S.C. 2017). For instance in *Goewey v. United States*, 886 F. Supp. 1268, 1282-83 (D.S.C. 1995), where the plaintiff's theory of liability was an acute toxic exposure to the organo-phosphate known as tri-ortho-cresyl phosphate, a compound which produces a delayed toxic reaction, the court granted the defendant's motion for summary judgment because the plaintiff's experts could not causally relate the injuries.

Here, like in *Miller*, expert medical testimony is not necessary to establish causation. This case does not involve personal injury claims related to medical malpractice, toxic chemical exposure, or preexisting cancer. Rather, like *Miller*, Lewis suffered an acute injury immediately following a slip. Nothing indicates Lewis was suffering from a patellar tear before the slip.

Circle K's own employee, Mr. Waples, who witnessed Lewis slip and fall, stated Lewis slipped on the painted parking lot stripe. Mr. Waples knew this because he could see Lewis' visible slip mark on the painted line. Therefore, when viewed in the light most favorable to Lewis, a reasonable jury could find based upon the testimony of Lewis and other lay persons that Lewis' patellar tendon rupture was most likely caused by slipping on the wet painted stripe. Whether through expert or lay testimony, Lewis was able to put forth evidence that a jury could use to determine causation. The district court committed error in taking that decision from them, and

thus summary judgment was improperly granted.

**III.   THE DISTRICT COURT COMMITTED ERROR IN DENYING LEWIS' MOTION TO EXCLUDE THE TESTIMONY OF CIRCLE K'S EXPERTS DR. JOSEPH CALANDRA AND MR. BRANDON WIGGINS.**

Federal Rules of Evidence 104(a) and 702 require this Court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, at 589. Before permitting an expert to testify before the jury, the proponent of that expert must satisfy this Court, by a preponderance of the evidence, that "the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.,* at 592. Whether testimony will assist the trier of fact depends on whether the testimony is relevant to at least one issue in the case. Helpful testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.*, at 591 (citation omitted). Expert witnesses must also be qualified by "knowledge, skill, experience, training, or education" in the area on which they offer testimony. *See* Fed. R. Evid. 702.

"Scientific knowledge" is testimony "ground[ed] in the methods and procedures of science" and consisting of "more than subjective belief or unsupported speculation." *Daubert*, at 589–90. The testimony must arise from a reliable principle

or method which the purported expert reliably applied to sufficient facts and data. *See* Fed. R. Evid. 702(b). "Many factors" bear on whether testimony meets this standard. *Daubert*, at 593. A "key question" in deciding whether testimony constitutes scientific knowledge is "whether it can be (and has been) tested." *Id.* This is because a scientific methodology both generates hypotheses and tests them "to see if they can be falsified." *Id.* (citation omitted).

This "falsifiability, or refutability, or testability" is "[t]he criterion of the scientific status of a theory." *Id.* (citation omitted). Courts also consider (1) whether a theory has been subjected to peer review and publication, (2) what a particular technique's known or potential error rate is, *Id.* at 593–94, and (3) whether the "expert developed his opinions expressly for the purposes of testifying" or "through 'research they have conducted independent of the litigation,' " *See In re Lipitor*, at 920 (citations omitted); *see also Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.").

Rule 704(a) permits an expert to opine on "questions of fact that are committed to resolution by the jury." *U.S. v. McIver*, 470 F.3d 550, 561 (4th Cir.

2006). An expert may not, however, offer opinion testimony "that states a legal standard or draws a legal conclusion by applying law to the facts." *Id.,* at 561–62. Such testimony "would merely tell the jury what result to reach" and is "inadmissible." *Elat v. Ngoubene*, 993 F.Supp.2d 497, 512 (D. Md. 2014)(collecting authorities for the proposition that expert testimony that "supplies the jury with no information other than the witness's view of how the verdict should read" is inadmissible).

**A. Dr. Calandra's testimony was erroneously allowed by the district court because Dr. Calandra employs no scientific method, developed his opinions solely for litigation, and cannot assist the jury in determining facts in issue.**

Dr. Calandra does not apply any scientific method to reach his opinions. Instead, Dr. Calandra's opinions are connected to the data—in this case, the medical records—only by Dr. Calandra's "*ipse dixit*." *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Dr. Calandra himself agrees that his "method" for reaching his opinions was reading the medical records, reviewing the video, and then authoring his report. Dr. Calandra offers no way to test either his method or his opinions. Indeed, there is no way to test and falsify or otherwise evaluate his methodology. Dr. Calandra's opinions do not qualify as "scientific" or "knowledge" under *Daubert* because they are neither "ground[ed] in the methods or procedures

of science" nor "more than subjective belief or unsupported speculation." *Daubert*, at 590.

Dr. Calandra has published no articles on either his specific opinions in this case or containing his general opinions which support those he has reached in this case. As discussed below, this suggests that Dr. Calandra's opinions were developed for litigation. *See In re Lipitor*, at 920. Further, there is a distinction between anecdotal evidence and a reliable, controlled clinical trial, with the latter being more reliable. Dr. Calandra admits his method is more analogous to the anecdotal report than the clinical trial. In other words, Dr. Calandra cannot show his "[p]roposed testimony [is] supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, at 590. Put another way, Dr. Calandra has taken the first step toward scientific knowledge by generating a hypothesis, but has failed the crucial step of *testing* that hypothesis "to see if [it] can be falsified" which is a critical criterion for showing that an opinion is based on science and not mere conjecture. *Id.,* at 593.

Nor has Dr. Calandra calculated his own error rate. As discussed above, Dr. Calandra himself is the method—his opinions are derived from his review of the medical records. Thus, it is Dr. Calandra's error rate that is at issue, which Dr. Calandra testifies he has no way of knowing. Dr. Calandra points to jury verdicts

where juries found for the defendant for whom Dr. Calandra had testified in the past as a possible proxy, but concedes that juries may have sided with those defendants for reasons other than whether Dr. Calandra's testimony was correct.

Calandra may also simply be persuasive without being correct—after all, *Daubert*'s inquiry is necessary because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, at 595. Thus, the assertion that juries have agreed with Dr. Calandra all but one time cannot meaningfully serve as a proxy for Dr. Calandra's error rate. Dr. Calandra's opinions fail the key *Daubert* considerations, and the district court abused its discretion in not excluding his testimony.

Although Dr. Calandra makes general references to studies, literature, and research, he repeatedly testified that his opinions in this case were not based on any particular studies, literature, or research. When asked whether he relied on any studies to form any of his opinions in the case, Dr. Calandra answered "No, I did not." When discussing the lack of studies, Dr. Calandra testified, "So there's — so those are, I guess, supporting studies so, but I don't have particular specific things in my head. I wasn't asked to look that stuff up." In other words, Dr. Calandra's testimony arises not from a scientific quest for truth, but from the requirements of litigation.

While Dr. Calandra has an orthopedic career spanning approximately 40 years, he did not perform research during that time on his patients who had experienced a ruptured patellar tendon. He has never performed any controlled testing related to his opinions in this case, never published any papers related to patellar tendon ruptures, and never spoken at professional conferences about patellar tendon ruptures. In other words, Dr. Calandra did nothing to form the opinions he is expressing in this case before Circle K hired him to form his opinions in this case, showing that his opinions are tailormade for this litigation.

While Dr. Calandra states he holds each of these opinions to a reasonable degree of medical certainty, several are couched in hypothetical language. For example, he testifies that Lewis' pre-existing factors "may have" contributed to a chronically weak patellar tendon, and "it is possible" that the patellar tendon ruptured first. But these opinions will not help the jury determine any fact in issue, as it is common sense that any plaintiff "may have" preexisting factors which contribute to their injuries. Dr. Calandra's opinion adds no clarity on this issue. Likewise, saying that "it is possible" that Lewis' patellar tendon ruptured first, while true, does not help the jury evaluate what the cause of Lewis' patellar tendon rupture was. Even if these opinions were based on a reliable scientific method or principle reliably applied to sufficient data (they are not), the district court committed an abuse

of discretion in not excluding them to prevent confusion for the jury. *See* Fed. R. Evid. 403. This Court should remedy these errors and reverse with instructions to the district court to grant Lewis' motion and exclude these opinions from trial.

**B. Mr. Wiggins' testimony was erroneously allowed by the district court because his testimony invades the province of the jury and fails to consider all relevant data.**

In his report and at his deposition, Mr. Wiggins states his opinion that based on the documents reviewed by SEA Site Investigation, "it has not been established that the walking surface at the time of the incident was not slip-resistant, and therefore it cannot be reasonably concluded that any applicable code relevant to the fall scenario has been violated." This opinion is fatally flawed as expert testimony because Mr. Wiggins' opinion is simply an evaluation of the weight of the evidence, not an expert opinion, and thus invades the province of the jury. Further, Wiggins fails to evaluate all relevant data and is not qualified to do so. This results in a significant analytical gap between the data Mr. Wiggins does analyze and the conclusion.

Mr. Wiggins' testimony invites the jury to substitute his opinion for their own. By its own terms, Mr. Wiggins' opinion arises from "the documents reviewed by SEA Site Investigation" and purports to prescribe what can or "cannot be reasonably concluded" based on the evidence that Mr. Wiggins reviewed. Further, despite

visiting the site of the fall and having ample opportunity to inspect and test the site, Mr. Wiggins chose not to take independent measurements of slip resistance. In other words, Mr. Wiggins did not form his opinion by independently evaluating the site, but only by reviewing another expert's work and deciding what conclusions that work "reasonably" supported.

Mr. Wiggins' opinion is nothing but an evaluation of the weight of the evidence, which "undertakes to tell the jury what result to reach" and "does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Elat*, at 512 (quoting *U.S. v. Chapman*, 290 Fed. Appx. 253, 269 (4th Cir. 2006)). Mr. Wiggins' opinion may be fine fodder for Circle K's cross-examination of Lewis's retained expert, but it is not the proper subject of expert testimony at trial.

Mr. Wiggins also fails to consider how a Circle K employee was using cleaning products when Lewis slipped and fell, and Wiggins is not qualified to evaluate that information in the first place. When questioned on this point, Mr. Wiggins repeatedly testified that he does not have any experience with the cleaning products at issue. Neither has Mr. Wiggins investigated or received training on the effect the cleaning products would have on the surface at issue.

Mr. Wiggins has no opinion on the proper storage of cleaning products,

because, as an engineer, he does not "get involved with cleaning products." The "extent of [Mr. Wiggins'] investigation into the [two] cleaning product[s]" that the Circle K employee was potentially using was "look[ing] at the directions for both" and noting that "both contemplated a — a wet application." Thus, Mr. Wiggins can admit that the Circle K employee was not using the cleaning products according to manufacturer specifications. But Mr. Wiggins cannot opine as to what effect that failure to follow manufacture directions might have.

Mr. Wiggins does not first consider and then disregard the information about the effect the cleaning products will have on the walkway's slip resistance due to his testing, training, experience, or qualifications as an expert. Instead, Mr. Wiggins never considered the information while forming his opinion and was not qualified to do so.

As a result, Mr. Wiggins' opinion regarding the slip resistance of the area where Lewis fell is based on a classic analytical gap. Mr. Wiggins opines that because he cannot interpret evidence that the area was less slip resistant at the time Lewis fell, the evidence must not exist. *See Franco v. Boston Sci. Corp.*, No. 2:12-CV-02748, 2016 WL 3248505, at \*15 (S.D. W. Va. June 13, 2016)(excluding purported expert opinion that "because [the expert] did not find any evidence" of a litigant's assertions, "none exists")(citing *Gen. Elec. Co.*, at 146). Because his

opinion ignores information that Mr. Wiggins cannot interpret, Mr. Wiggins' testimony should have been excluded. This Court should remedy these errors and reverse with instructions to the district court to grant Lewis' motion and exclude these opinions from trial.

**IV.   THE DISTRICT COURT COMMITTED ERROR IN DENYING LEWIS' MOTION REGARDING SPOLIATION.**

Under federal common law, a party who anticipates litigation has a duty to preserve material evidence that may be relevant to the litigation. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 106 (E.D. Va. 2018). Failure to satisfy this duty generally amounts to spoliation, i.e., "the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri*, at 590.

A party seeking sanctions for spoliation must prove: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by "culpable state of mind'; and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it. *Goodman v. Praxair Servs., Inc.*, 632 F. Supp.

2d 494, 509 (D. Md. 2009).

With respect to the first element, there is no doubt Circle K was aware of its duty to preserve the location of Lewis' slip and fall until Lewis could conduct a site inspection. Lewis filed his lawsuit against Circle K in November 2022. Counsel for Circle K appeared and filed an answer in state court in January 2023. At the very latest, Circle K was aware it should preserve the slip and fall location as-is in January 2023. It is undisputed that it did not do so.

As for the second element, there are three states of mind that can satisfy the culpability requirement: knowing destruction, gross negligence, and ordinary negligence. *Goodman,* at 518. The degree of fault impacts the severity of the sanction, and this Court has established guidelines to determine when the harshest sanctions, such as summary judgment or default, should be implemented. *Nucor Corp. v. Bell*, 251 F.R.D. 191, 193-94 (D.S.C. 2008).

Due to the sophistication of Circle K and the timing of the destruction of evidence, it is clear Circle K acted knowingly and intentionally when it repainted the parking lot paint stripes just prior to Lewis' site inspection. There is no conceivable scenario where Circle K would not know its legal obligations to identify and preserve relevant evidence. Circle K is no stranger to suits brought against it in state and federal courts both in this State, Circuit, and across the country. In any premises

liability lawsuit, a defendant would need to preserve evidence like this case.

But even if Circle K did not fully comprehend its obligation to preserve relevant evidence, it has had counsel since at least January 2023. Circle K's destruction of relevant evidence is more than simple negligence. Spoliation must involve more than the "'negligent loss or destruction of evidence,'" as "the alleged destroyer must have known that the evidence was relevant to some issue in the anticipated case, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction. However, bad faith need not be shown." *Steves & Sons, Inc.,* at 104.

Lewis need not show Circle K acted in bad faith in the destruction of the relevant evidence, only that Circle K willfully engaged in conduct that resulted in the loss of the evidence. Here, Circle K allowed a third-party to paint over the location of Lewis' slip and fall, knowing that a site inspection was going to occur there. Based on the invoice from Central Carlina Pressure Washing Inc., the parking lot stripes are repainted each year. Circle K certainly knew this and could have taken reasonable steps to postpone the work. Additionally, Circle K could have informed Lewis' counsel of the upcoming restripe work and offered a date for site inspection before the work was to be completed. More concerning is the fact that Lewis' expert was the one to notice the fact the paint stripes had been repainted. Had it not been

for Dr. Durig's keen eye, it is likely Circle K's destruction of evidence would have gone unnoticed.

In the context of spoliation, lost evidence is relevant if "a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 512 (S.D.W. Va. 2014). The condition of the parking lot's paint stripe at the time of the fall is clearly relevant to Lewis' ability to prove negligence. To prove negligence, Lewis must show Circle K created an unreasonably dangerous condition that was a contributing cause of Lewis' injury. Lewis alleged the negligent use of a concrete cleaner over parking lot paint stripes created an unreasonably slippery condition that violated Circle K's standard of care and caused Lewis to injure himself.

There can be no doubt that the evidence Circle K destroyed was relevant and necessary to Lewis' claim. Circle K painted over the condition at issue so it could not be accurately tested to prove Lewis' claim and then Circle K argued that summary judgment should have been granted as the condition that caused the fall cannot be tested. Spoliation sanctions "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Silvestri*, at 590. The true purpose behind the spoliation doctrine is "leveling the evidentiary

playing field" and appropriately sanctioning improper conduct. *Goodman*, at 511.

The district court should have leveled the evidentiary playing field by directing a verdict on liability because of Circle K's destruction of evidence. At the very least, the district court should have struck Mr. Wiggins' expert opinions to the extent they rely on the lack of coefficient of friction testing as a foundation, and should have ruled that it would instruct the jury that they are permitted to infer that the evidence of coefficient of friction testing, if conducted before the parking lot striping paint was repainted, would have been unfavorable to Circle K. This Court should remedy these errors and do just that.

## CONCLUSION

For all the reasons set forth above, Lewis respectfully requests that this Court reverse the district court's Order and Final Judgment, and remand this case back with instructions for the district court to grant Lewis' motion to strike experts and grant Lewis' motion for sanctions as set forth above.

Respectfully Submitted,

By  */s/Brian J. Lee*
BRIAN J. LEE

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing Brief has been electronically filed with the Clerk of the Court by using the CM/ECF system, which will serve by electronic notification all counsel or parties of record, this 23rd day of October, 2025.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

This Brief complies with all requirements of Fed. R. App. P. 32(a), including the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i), because this Brief contains 12,637 words. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6), because this Brief has been prepared in a proportionally spaced typeface in 14-point Times New Roman style.

**MORGAN AND MORGAN**

By */s/ Brian J. Lee*
**BRIAN J. LEE, ESQUIRE**
**JOSEPH SANDEFUR, ESQUIRE**
501 Riverside Avenue, Suite 1200
Jacksonville, Florida 32218
E-Mail: blee@forthepeople.com
E-Mail: jsanderfur@forthepeople.com
Telephone: (904) 456-6816
Facsimile (904) 456-6816
*Attorneys for Appellant*